UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA,        )        Case No. 3:17-CR-119
                                 )
            Plaintiff,           )
                                 )
      VS.                        )
                                 )
JIHAD HAQQ,                      )
                                 )        December 6, 2019
            Defendant.           )        Louisville, KY

* * * * *

TRANSCRIPT OF SENTENCING
BEFORE HONORABLE REBECCA GRADY JENNINGS
UNITED STATES DISTRICT JUDGE

* * * * *

APPEARANCES:

For United States:        Erin G. McKenzie
                          Robert B. Bonar
                          U.S. Attorney's Office
                          717 West Broadway
                          Louisville, KY 40202

For Defendant:            Rob Eggert
                          Tricia F. Lister
                          600 West Main Street, Suite 200
                          Louisville, KY 40202

[Defendant present.]


                    April R. Dowell, RPR, RMR, CRR
                        Official Court Reporter
                         232 U.S. Courthouse
                        Louisville, KY 40202
                           (502) 625-3779

Proceedings recorded by mechanical stenography, transcript
produced by computer.

1    (Begin proceedings in open court 10:39 a.m.)

2    THE COURT:  We are going on the record this morning

3    in United States versus Haqq, 3:17-CR-119.  Can I have

4    appearances for the record?

5    MS. MCKENZIE:  Good morning, Your Honor.  Erin

6    McKenzie and Rob Bonar for the United States.

7    THE COURT:  All right.

8    MR. EGGERT:  Good morning, Judge.  Rob Eggert and

9    Tricia Lister for Jihad Haqq.

10    THE COURT:  Okay.  All right.  Mr. Haqq, you're here

11    today represented by counsel; is that correct?

12    THE DEFENDANT:  Yes, ma'am.

13    THE COURT:  All right.  And that's Mr. Eggert and

14    Ms. Lister sitting next to you, right?

15    THE DEFENDANT:  Yes, ma'am.

16    THE COURT:  Okay.  So as you're aware back in August

17    you and your attorney appeared and you entered a guilty plea

18    to one count contained in the superseding indictment pursuant

19    to a C plea.  Do you remember that?

20    THE DEFENDANT:  Yes, ma'am.

21    THE COURT:  Okay.  And at that point in time, the

22    Court reserved on whether to accept or reject that plea.  Do

23    you remember that?

24    THE DEFENDANT:  Yes, ma'am.

25    THE COURT:  Okay.  So today I want to make sure you

1  understand how we're going to proceed.  We're going to talk

2  about this presentence investigation report today.  It's going

3  to be our first topic of conversation.  We're then going to

4  rule on the appropriate sentencing guideline range based on

5  that presentence investigation report.

6          Then your counsel will have an opportunity to make

7  any arguments and address the 3553(a) factors.  You'll have a

8  chance to address the Court directly if you choose to do so as

9  well.  That's completely voluntary but want you to know that's

10  available to you.

11          I'll then make a determination on whether to accept

12  or reject the plea agreement.  I will announce sentence and

13  then give you your appeal rights.  Do you understand generally

14  how it's going to go today?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  Okay.  All right.  Pursuant to 18 U.S.C.

17  3771(a), my understanding is the victims have been notified in

18  this case; is that correct?

19          MS. MCKENZIE:  Yes, ma'am.

20          THE COURT:  Okay.  So in advance of today's hearing,

21  I have received and reviewed the presentence investigation

22  report, the government's sentencing memo, the defendant's

23  sentencing memo and the supplement provided by the government.

24          Are there any other documents that the Court does

25  not have in front of it that I need to review?

1          MS. MCKENZIE:  I don't believe so, Your Honor.

2          MR. EGGERT:  No, Your Honor.

3          THE COURT:  Okay.  All right.  So, Mr. Eggert, have

4    you and your client read and discussed the presentence

5    investigation report?

6          MR. EGGERT:  Yes, Your Honor.

7          THE COURT:  All right.  Do you feel you've had a

8    sufficient opportunity to do so?

9          MR. EGGERT:  Yes.

10          THE COURT:  All right.  And, Mr. Haqq, have you had

11    an opportunity to read that report all the way through?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  Okay.  Do you feel you've had a

14    sufficient opportunity to talk to your counsel about it?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  Ask all the questions you need to?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Okay.  All right.  So based on my review

19    of the PSR and the passage of the applicable time for

20    objections, there are no objections to the PSR in the record.

21    Are there any additional objections that have not already been

22    handled?

23          MR. EGGERT:  No, Your Honor.

24          MS. MCKENZIE:  None from the United States.

25          THE COURT:  All right.  So hearing no objections,

1    I'll adopt the facts, information and guideline calculations

2    contained in the PSR as true and I will rely on them today for

3    sentencing purposes.  The PSR shall be placed in the record

4    and filed under seal.  In the event of an appeal, the parties,

5    their counsel and the Sixth Circuit Court of Appeals will have

6    access to that PSR.

7           So, Mr. Haqq, although the guidelines are no longer

8    mandatory, they are a starting point for the Court's

9    consideration of your sentence and that's a sentence that's

10   sufficient but not greater than necessary.

11          So we're going to first calculate the advisory

12   guideline range.  Here the defendant's base level is 26.

13   There are no adjustments.  There's a two-level reduction for

14   acceptance of responsibility under 3E1.1(a) and a one-level

15   reduction for acceptance of responsibility under 3E1.1(b)

16   should the government make the motion bringing the total

17   offense level to 23.

18          The defendant's criminal history score is seven

19   placing him in a criminal history category of four.  This

20   would produce a guideline range of 70 to 87 months

21   imprisonment.  Probation is not authorized under the

22   guidelines.  A supervised release range following imprisonment

23   of three years to life and a fine range of 20,000 to 1 million

24   dollars.  Is there any objection to that calculation of the

25   guidelines?

1              MS. MCKENZIE:  No, ma'am.

2              MR. EGGERT:  No, Your Honor.

3              THE COURT:  Okay.  The special assessment here is a

4     hundred dollars.  Restitution is not an issue.  There was

5     forfeiture requested; is that correct?

6              MS. MCKENZIE:  Yes, ma'am.

7              THE COURT:  And what is the nature of that

8     forfeiture?

9              MS. MCKENZIE:  I apologize.  The government --

10             THE COURT:  Is that just anything from the

11    investigation?

12             MS. MCKENZIE:  Yes.  And I am specifically looking

13    at $19,162 in U.S. currency.  And that may be -- that may be

14    it actually.

15             THE COURT:  Okay.  And I apologize.  I didn't look.

16    Was there a preliminary order of forfeiture filed?

17             MS. MCKENZIE:  Yes.

18             THE COURT:  Okay.  Okay.  So it's my understanding

19    you have a C plea for 97 to 121 months, a plea agreement range

20    of supervised release of three years.  The fine is not

21    addressed, restitution is not addressed and then the

22    forfeiture in the agreement is the $19,162.  Is that an

23    accurate portrayal of your agreement?

24             MS. MCKENZIE:  Yes.

25             MR. EGGERT:  Yes, Your Honor.

1          THE COURT:  Okay.  All right.  So at this point in

2     time, I'm going to ask the government if they are intending on

3     making the motion for the third-level decrease for acceptance

4     of responsibility under 3E1.1(b).

5          MS. MCKENZIE:  We do make that motion, Your Honor.

6          THE COURT:  Okay.  So, Mr. Haqq, with that motion

7     having been made by the government, I'm going to grant it.  So

8     you're getting full credit for your acceptance of

9     responsibility, okay?  So that point will be deducted.

10          Now, I do want to address any other motions as well

11     as the 3553(a) factors.  I want to address one issue at the

12     bench before we get there, but then I'm going to have you

13     present your arguments.  So if counsel can approach for a

14     moment.

15          (Sealed bench conference filed separately.)

16          THE COURT:  All right.  Mr. Eggert, are you ready to

17     proceed?

18          MR. EGGERT:  Yes.

19          THE COURT:  All right.  And I'll let you-all choose

20     who would like to speak first on the 3553 -- actually, before

21     I get there, is it the government's intention to make the

22     motion to dismiss count two?

23          MS. MCKENZIE:  Yes, Your Honor.

24          THE COURT:  Okay.  I'm going to grant that motion as

25     well today.  And with that behind us, let's address the

1    3553(a) factors.  Whoever of you prefers to go first, I'm fine

2    with that.

3            MR. EGGERT:  Perhaps if the government goes first,

4    that might help in this case.

5            MS. MCKENZIE:  Okay.

6            THE COURT:  All right.

7            MS. MCKENZIE:  Certainly.

8            THE COURT:  Ms. McKenzie?

9            MS. MCKENZIE:  And, Your Honor, my arguments -- my

10   comments will largely track if not repeat what the government

11   has submitted in its written filings in the original

12   sentencing memorandum as well as the supplement to the

13   sentencing memorandum.

14           We did arrive at a C plea for a sentence of 97

15   months in this case.  That amounts to roughly a ten-month

16   upward de -- or upward variance from the calculated advisory

17   sentencing guideline range, however the United States believes

18   that that sentence is sufficient but not greater than

19   necessary under 3553 -- 18 U.S.C. 3553(a)(2) to accomplish the

20   statutory sentencing purposes set out there.

21           And just to touch on some of those factors that I

22   think weigh heavily in this case.  The first factor set out in

23   the statute is that the Court will consider the nature and

24   circumstances of the offense.  The offense of conviction here

25   is a plea to trafficking in heroin.

1          And that -- I mean, that is something that the Court

2   sees and hears on a daily basis, but in this case I think --

3   and that's why I submitted with our supplement such a

4   voluminous selection of documents because I think there's

5   offense conduct here that really gives contour to the nature

6   of that trafficking in this case.

7          This was not a situation where, you know, we caught

8   someone being a courier driving heroin from one place to

9   another, you know, to simply drop it off.  It's not a

10  situation where we found somebody being a courier to drop drug

11  money off from one place to another.  The discovery in this

12  case revealed that Mr. Haqq engaged in -- it was -- you know,

13  he was a small businessman, he had a lawn business, he had a

14  tow truck business, and he had a heroin business and he kind

15  of ran them all simultaneously.

16         And the -- the phone extractions show that, you

17  know, while he would be out cutting lawns, he would also be

18  meeting up with customers to serve them small amounts of

19  heroin.  And these customers, they were addicts.  They were

20  people, you know, living on that fine line between, you know,

21  life and death, and they were people who were giving him their

22  last $20, their last $60, just to get through a day.

23         And the behavior here I think -- I think when the

24  Court looks at the seriousness of this offense, the Court has

25  to take into account the real human impact of what he was

1  doing because this was just a side job to him.  This was just

2  money in his pocket, and he's taking their last 20, their last

3  50 and going on and posting, you know, himself on Instagram

4  going on a cruise and shopping at designer -- you know,

5  designer luxury stores while he's making a profit off of just

6  the absolute destruction of human life.

7         And so I just -- I want to reiterate that because I

8  think sometimes in this setting when we are talking about

9  possession with the intent to distribute or distributing a

10  controlled substance, that sounds so clinical and -- and the

11  human reality of this gets lost.

12         Beyond that, Your Honor, I think this ten-month

13  upward variance is justified under the statute because if you

14  look at Mr. Haqq's criminal history, this is not the first

15  time that he has found himself in a position to really destroy

16  lives.  And in the PSR -- I'm looking at paragraphs 35 and

17  36 --

18         THE COURT:  35?  Okay.

19         MS. MCKENZIE:  There -- there are -- in 35 I believe

20  the conviction for the manslaughter, facilitation to murder,

21  tampering with physical evidence, and the facts of that are

22  kind of spelled out in more detail.  And then below that

23  there's another conviction for a state offense that's called

24  engaging in organized crime as a criminal syndicate, and that

25  criminal syndicate is described in the factual paragraph

1    above.

2           And it's a syndicate known as the Victory Park

3    Crips.  And, you know, you ask any law enforcement officer

4    that's worked anywhere inside Jefferson County for the last 30

5    years and they're going to immediately know who the Victory

6    Park Crips are and what they do.

7           And I say this because the way -- the way this

8    happened, this all got sentenced -- it ran concurrently.  It

9    was a concurrent sentence in state court, so the way the

10   guidelines calculate this, he gets a total of three criminal

11   history points, but those offenses actually reflect not just a

12   single event, a single transaction or -- I guess we consider

13   it a single course of conduct, but what it actually is is a

14   pattern of a certain nature of offense and offense dates

15   spread out over years.

16          So I think this is -- you know, and we did not move

17   for an upward departure under the guidelines.  We had a C plea

18   agreement because we believe that is the appropriate sentence,

19   but I think when the Court is looking for justification to

20   vary upward from the calculated guideline range, I think you

21   can consider the fact that there is specified in the

22   guidelines a basis for upward departure when there are

23   multiple crimes of a certain nature that occurred on different

24   dates that were sentenced together, and if they had been

25   scored with criminal history points separately, how would that

1    affect his criminal history score.

2         And in this case if he had been scored separately

3    for these offenses, instead of a four, he would be a five.  He

4    would have ten criminal history points because he didn't

5    receive any additional points for that engaging in organized

6    crime.

7         And if he's -- if he's a criminal history five with

8    an offense level of 23, then a 97-month sentence is right

9    smack in the middle of where his range would be.  And I think

10   that is fair for the Court to consider particularly because of

11   the nature of those prior offenses.

12        I mean, we are not talking about a scheme where he

13   stole credit cards and went wild, you know, shopping on them

14   over a period of time.  We are talking about the loss of life

15   and -- and in a violent -- in the course of the business of a

16   violent street gang, so I think that is fair for the Court to

17   consider.

18        And I do think that this is a sentence that is

19   sufficient but not greater than necessary to deter this

20   conduct in the future and to provide adequate punishment, to

21   provide the defendant with, you know, enough time in the

22   Bureau of Prisons to obtain, you know, vocational training,

23   any treatment that he might need, any other sort of

24   assistance -- any benefits that he can get from his time in

25   the system.

1        So for those reasons and any other reasons in our

2   pleadings that I have not touched upon, I would ask the Court

3   to accept the C plea and make the finding that a 97-month

4   sentence is appropriate and is sufficient but not greater than

5   necessary under 3553(a).

6        THE COURT:  All right.  Mr. Eggert?

7        MR. EGGERT:  Judge, obviously we would ask for the

8   lowest end of the C plea which is 97 months.  Having said

9   that, I think I need to correct something in the

10  commonwealth's -- I mean, the government's argument.

11       Mr. Haqq was sentenced to 11 years on the case from

12  2002 and that is on the manslaughter second degree.  The

13  reason that that subsequent case ran concurrent is what -- he

14  didn't commit any new crimes.  They all were crimes that were

15  part of the 2002 case.

16       In fact, I don't believe my client was even out in

17  2007, so -- because he had an 11-year sentence.  So I

18  understand the commonwealth's argument on that and it is a --

19  you know, a criminal history that's significant, and so I can

20  see why they'd ask for more, but I don't want the Court to

21  have that opinion that he got out and then engaged in criminal

22  syndication because that's not what happened.  That's not the

23  facts and that is -- if it was the facts, it would have to

24  have run consecutive and ran concurrent.

25       Regarding, Judge, Mr. Haqq's luxurious lifestyle, he

1   has never had a luxurious lifestyle.  He's a person that

2   basically has always had to scrape to survive.  If you look at

3   that criminal history -- I mean, when you look at his

4   background, it's noted in the PSI that he grew up -- and this

5   is putting it charitably -- very difficult circumstances, that

6   at -- you know, sometimes there wasn't -- there was only bread

7   in the home and that Mr. Haqq was there.

8          And that he of necessity was in the streets very,

9   very, very early in life to survive.  I'm not saying that this

10  isn't significant.  I'm not saying the case -- I'm not saying

11  the priors aren't significant, but when you look here at some

12  of the things that's said in the PSI, boy, it's enough -- it

13  also talked about the abuse of his mother and he became

14  emotional about it.  He'd obviously seen it -- seen that

15  abuse.

16         He's also a person, Judge, that has in his community

17  given to people.  He's given money.  He's given food.  He's

18  given other drives.  He's not someone who's just a selfish

19  person.  And he's made mistakes, yes, but he's someone that

20  really has tried to benefit his community in a lot of ways and

21  himself and has struggled with all kinds of things.

22         And when they say he became emotional after --

23  after, you know, seeing -- talking about the abuse, that's

24  because he saw it.  So I think that 97 months given

25  everything -- all the circumstances is sufficient.  It's more

1   than sufficient and we'd ask the Court to do that.  Thank you,

2   Judge.

3           THE COURT:  All right.  At this time are there any

4   victim statements?

5           MS. MCKENZIE:  Yes.  I believe -- I believe there

6   are.

7           THE COURT:  And my understanding is the preference

8   is to speak from the podium.

9           MS. MCKENZIE:  Yes.

10          UNIDENTIFIED SPEAKER:  Your Honor, thank you for

11  giving myself and my family a time to talk real quick.  I

12  can't bring myself to refer to him other than trash 'cause

13  that's what he is.  He's trash.  He's directly responsible for

14  the opoid crisis in our city.  He traded sex and money for

15  drugs and --

16          MR. EGGERT:  Judge, I'd have to object right now.

17  I'd ask that the remarks be directed to the Court, not my

18  client.  My client's not trash and I'd have to object to that.

19          THE COURT:  You need to speak directly to me.

20          UNIDENTIFIED SPEAKER:  Sure.

21          THE COURT:  And I understand today -- and I'll say

22  this for everybody in the room 'cause I understand today there

23  are a lot of high emotions and sentencings contain high

24  emotions, but part of the court system is that everything gets

25  directed to me.  I even tell the lawyers when they start

1   talking at each other that they're not allowed to do that.  It

2   all has to be directed to me, okay?

3          And that's just to maintain the composure of the

4   room and certainly maintain your composure and your family's

5   and his family's as well.  So you can continue with your

6   statement.  Just make sure you're talking directly to me.

7          UNIDENTIFIED SPEAKER:  That's fine.  Well, "that"

8   has traded drugs for sex, money and lives.  We know this.

9   He's now directly responsible for two deaths in our community

10  of young ladies.

11         THE COURT:  Okay.

12         MR. EGGERT:  Judge, I'd object again.

13         THE COURT:  All right.  I understand the objection.

14  And maybe I should have said this to the room as a whole.

15  We're here today to talk about this specific conviction and

16  I -- drugs are a scourge on society.  You are a victim of that

17  scourge and of addiction.

18         And so we are here today and can talk about that

19  addiction being the result of this sale of drugs in society

20  and I think that's -- that's fair to talk about, but we need

21  to maintain to just the count that has been pled guilty to and

22  just the count at issue here, okay?

23         UNIDENTIFIED SPEAKER:  Sure.  Well, I can no longer

24  enjoy my daily life.  He took my happiness.  I hope you or

25  anyone else never has to wake up to your wife saying "Call

911" and doing CPR on your daughter for 20 minutes.

And nobody back there in that room would be here supporting him if it was their daughter. I'm just imploring you to give him the toughest sentence you can give. That's all I can ask. Just do the right thing.

THE COURT: All right. Thank you. Are there additional statements?

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

THE COURT: And I'm sorry. I recognized who he was. I have not seen you before. Can you just state your name for me?

UNIDENTIFIED SPEAKER: Duall [phonetic], the victim's brother.

THE COURT: Okay. Thank you.

UNIDENTIFIED SPEAKER: The year I first moved out of our home, my sister wrote an essay for school about our childhood years together and how things had changed after I was gone. She ended that essay saying she would give me the world and that she knew she would always be there for me.

She didn't have to give me the world because she was my world and she doesn't get to be here anymore for me because of the distribution of these drugs, and until we hold people responsible for that to account, it's going to keep happening to more families besides just mine.

THE COURT: All right. Thank you, sir. Any

1  additional statements?

2       UNIDENTIFIED SPEAKER:  There are no words to

3  describe the deep pain and loss that we have to feel for the

4  rest of our lives.  The "could haves," the "should haves," the

5  thoughts.

6       I'll never get to plan my daughter's wedding.  Have

7  her grandchildren.  She wanted five.  There's just so much joy

8  that's been taken from us.  And Payton was innocent.  She was

9  pure of heart and trusting.  And I'm not saying she was

10  perfect.  There's no such thing.  And all she ever wanted to

11  do was help people and that's exactly what she was trying to

12  do.

13       Payton worked at a physician's office that treated

14  addiction and that's where she met a patient there and that's

15  when she got pulled into a world she didn't understand.

16  Active addicts know exactly what to say and what to do and who

17  they can manipulate.  Payton was young and naive and she

18  didn't understand that world.

19       And regardless of what we said or did, like most

20  young adults, she don't listen to her parents.  And even

21  though she overdosed, she was not an addict but the worst

22  happened, and we no longer have our daughter because people in

23  this world prey on the sick and the weak to fill their

24  pockets.

25       I think that if criminals in the justice system

1  could just feel for one day what we feel, that maybe they

2  wouldn't do what they do or at least maybe the justice system

3  would truly hold them responsible.

4      And I can only hope and pray, Your Honor, that you

5  will consider this when making your decision because we've

6  been sentenced to a lifetime of heartache and it feels like

7  we'll never have -- be able to live our life the way we did

8  before.  It's just -- I don't know, it's like you've lost the

9  ability to dance in life.  I don't know how to explain it.

10      And I feel he deserves at least a life sentence of

11  parole once he serves his time.  We'll never have full freedom

12  and he doesn't deserve to have it either and hopefully this

13  would help ensure he doesn't destroy other lives.

14      Payton was trying to make a difference in this world

15  and I hope that her death at least serves some purpose and

16  maybe saves some other people.  Thank you.

17      THE COURT:  Thank you.  All right.  Does the

18  defendant wish to allocute, Mr. Eggert?

19      MR. EGGERT:  No, Judge.  But if I could say two

20  things for him.

21      THE COURT:  Sure.

22      MR. EGGERT:  And that is obviously this is -- one

23  thing I forgot to say on his behalf besides other things,

24  obviously he had done coat and food drives for people, but the

25  thing I want to say, it's a tragic situation here, we

1  acknowledge that, but my client is -- he's not responsible for

2  any death and I want to make that clear and wanted to say that

3  on his behalf.

4  THE COURT:  Okay.  All right.  I've taken a

5  significant amount of time to review this case and I postponed

6  the hearing last time in order to spend a little more time

7  with it and to garner some more factual information about the

8  case which I was provided.

9  I have read the lengthy pages of text messages in

10  this case.  I've certainly looked through all of the documents

11  in the PSR and I have spent quite a bit of time considering

12  whether or not to accept or reject the C plea.  And the Court

13  doesn't get involved in C plea negotiations or any plea

14  negotiations whatsoever, but it's the Court's job at the end

15  when presented with a C plea to ensure that it's a sentence

16  that's sufficient but not greater than necessary.

17  And so that's why I postponed the last hearing in

18  order to get that information to be able to substantiate

19  whether or not to accept or reject the C plea.

20  There are many sentencing factors to consider here,

21  certainly the history and characteristics of Mr. Haqq, and

22  Mr. Eggert touched on those, particularly his background.  I

23  think there are some probably tragic issues from his childhood

24  that are not -- have not yet fully been addressed and that

25  should be and that goes, I think, to Ms. McKenzie's point

1    about treatment.

2           I think there are certainly issues with regards to

3    his criminal history.  Obviously, the first criminal history

4    looks like it was age 17, so he was rather young when he

5    garnered those first few -- first few interactions with the

6    criminal justice system.

7           And it does appear that his criminal history is --

8    is lengthy and he has chosen whether for purposes of belonging

9    or other reasons to engage in activity with a group --

10   criminal activity with a group.  And some of that is a sense

11   of belonging, some of that is a loss of guidance.  And

12   certainly by age 22 he had committed the great majority of his

13   criminal history points here.

14          I recognize the government's argument in regards to

15   the organized crime, criminal syndicate.  I do think the way

16   that was counted where it does not receive an additional

17   criminal history point is important here because I do believe

18   that had it been counted truly reflecting I think the

19   seriousness of it, his criminal history would have been

20   higher.  He would have been in a category five which would

21   have been a sentencing range of 84 to 105 months, and so the

22   97 months that was agreed upon here in the C plea would be

23   really right in the heartland of that and I think that's

24   probably what was intended by the parties in agreeing to this

25   C plea agreement.

1    The nature and circumstances of the offense here are

2    obviously very serious.  As I said before, the charge here is

3    distribution of heroin.  The results of addiction to drugs in

4    this society are very serious and they're exemplified by the

5    statements of the victims in this case.  And certainly there

6    are more victims.  I read -- I read all the text messages.

7    So taking that into account, this is obviously a

8    scourge on society and I agree we need to hold people

9    accountable for that to the extent that they engage in it.  We

10   need to promote respect for the law and adequately deter.  I

11   do believe the C plea here will do both of those -- both of

12   those things.

13   I also agree that this sentence will also enable

14   appropriate treatment for Mr. Haqq and appropriate

15   opportunities for him to work to better himself and to gain

16   skills and address certainly issues that appear from the PSR

17   have lingered in Mr. Haqq's life and need to be addressed.

18   So I do believe that the C plea in this case is

19   sufficient but not greater than necessary and I intend to

20   sentence in accordance with it and accept that agreement.

21   Anything further before I impose sentence from the United

22   States?

23           MS. MCKENZIE:  No, Your Honor.

24           MR. EGGERT:  No, Your Honor.

25           THE COURT:  Okay.  All right.  Then having

1     considered the advisory sentencing guidelines and 18 U.S.C.

2     3553(a) and accepting the binding plea agreement in this case,

3     the Court imposes the following sentence:  It's the judgment

4     of the Court that the defendant is committed to the custody of

5     the Bureau of Prisons for a term of 97 months as to count one

6     of the superseding indictment.

7             Upon release from imprisonment, the defendant shall

8     be placed on supervised release for a term of three years as

9     to count one.  The defendant shall abide by the standard

10    conditions of supervision adopted by the Court as well as the

11    special conditions, a copy of which has been provided to

12    defendant and counsel; is that correct?  Mr. Eggert, you've

13    received a copy?

14            MR. EGGERT:  Yes.

15            THE COURT:  Okay.  Those special conditions will

16    include cognitive behavioral therapy, being subject to search,

17    mental health treatment, substance abuse treatment and

18    testing, all of which will be explained by the United States

19    probation officer assigned to your case.

20            The defendant will be required to pay the special

21    penalty assessment fee of a hundred dollars as to the single

22    count of conviction.  Any financial sanctions imposed shall be

23    paid in accordance with the schedule of payments page

24    contained in the judgment.

25            Restitution is not an issue in this case.  A fine

1    and the cost of investigation, prosecution, incarceration and

2    supervision are waived due to the defendant's inability to pay

3    as set forth in the presentence investigation report.  Upon

4    motion of the United States, count two of the superseding

5    indictment is dismissed as to the defendant.

6         Having considered 18 U.S.C. 3553(a), the advisory

7    guidelines which produce a total offense level of 23 and a

8    criminal history category of four, the advisory guideline

9    ranges are 70 to 87 months custody, a fine of 20,000 to 1

10   million and three years supervised release.

11        Having granted the departure requested in the C

12   plea, the Court believes the sentence of 97 months custody

13   followed by three years supervised release is sufficient but

14   not greater than necessary to comply with the purposes set

15   forth in 3553(a)(2).  Are there any objections to the sentence

16   pronounced or the special questions imposed?

17        MS. MCKENZIE:  None from the United States.

18        MR. EGGERT:  No, Your Honor.

19        THE COURT:  Okay.

20        MR. EGGERT:  Judge, we would ask for a destination

21   closest to home.  And he has had internal bleeding in his

22   stomach, so we were going to ask for a recommendation of

23   Lexington.  I don't know that they would do that, but

24   that's -- we would make those two requests.

25        THE COURT:  Any objection from the United States?

1          MS. MCKENZIE:  To whatever extent I would have

2   standing to object, I don't -- I'm not sure that I really --

3          THE COURT:  All right.  I think -- is he requesting

4   evaluation for any particular program, Mr. Eggert?

5          THE DEFENDANT:  I just need help with my stomach.  I

6   just need help with my stomach.  I don't care where you send

7   me at.

8          THE COURT:  Okay.  All right.  Well, your family's

9   here in Louisville?

10         THE DEFENDANT:  Yes, ma'am.

11         MR. EGGERT:  Yes, they are.

12         THE COURT:  Okay.  All right.  So what we'll do is

13  I'm going to make -- I'm going to make three recommendations

14  for you.

15         THE DEFENDANT:  Can I talk to you one more time?  I

16  bleed in my stomach.  When I use the bathroom -- I don't even

17  like talking about this -- but blood is on the toilet paper.

18         THE COURT:  Okay.  So we need to get you some

19  medical treatment, and so what I think is probably the best

20  thing to do is I'm going to list several things.  I have no

21  control over the Bureau of Prisons, but what I can do is make

22  recommendations to them based on my review of the PSR and our

23  conversations in the courtroom.

24         And so the recommendations that I'm going to make --

25  and, Mr. Eggert, you can change the order of these if you

1  choose to, but I'm going to recommend first that he be

2  evaluated for medical issues and placement in a medical

3  facility, and then secondarily I'm going to ask for closest to

4  home, which is Louisville, Kentucky, and then thirdly, I'll

5  ask for evaluation for any -- what do I want -- mental health

6  treatment and drug -- drug addiction?

7            PROBATION OFFICER:  Yes, Your Honor.

8            THE COURT:  It's alcohol, right?

9            THE DEFENDANT:  Yes, ma'am.

10           THE COURT:  Okay.  So it's really alcohol addiction,

11  I think, is the main point and probably related to your

12  medical issues, certainly, based on what I read in that PSR.

13  So I'll make those three recommendations.  Is that the order

14  that you would request, Mr. Eggert, Mr. Haqq?

15           MR. EGGERT:  Yes.  Yes.

16           THE COURT:  Okay.  So that's the order I'm going to

17  put those into the judgment; evaluation for medical, placement

18  as close to home in Louisville and evaluation for mental

19  health and alcohol dependency.  All right.  We'll make those

20  recommendations.

21           So now, Mr. Haqq, I need to advise you of your

22  appeal rights.  Under most -- under some circumstances either

23  you or the United States would have the right to appeal your

24  conviction or sentence, however in this case you've waived

25  certain of your appeal rights in your plea agreement.  Do you

1    remember that?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  Okay.  So in that plea agreement, you

4    said that you didn't intend to -- you waived your right to

5    appeal except for purposes of prosecutorial misconduct or

6    ineffective assistance of counsel.  Those limitations on

7    appeal rights are typically upheld by the Court, but any

8    appeal that you choose to make from today or from this case

9    would need to be made within 14 days of the judgment and the

10   judgment will probably be entered sometime early next week.

11   If you're unable to pay the cost of appeal, you can apply for

12   leave to appeal as a pauper.  Do you understand that?

13             THE DEFENDANT:  Yes, ma'am.

14             THE COURT:  Okay.  So this is a document that

15   Ms. Morgan's going to bring you that indicates that I've given

16   you your appeal rights.  If you want to review that, and if

17   you agree to it, please sign it and date it.

18             All right.  Thank you, sir.  All right.  Mr. Haqq is

19   currently in custody.  He'll be remanded to the custody of the

20   United States Marshals for deliver to the Bureau of Prisons.

21             I appreciate everybody's patience with this

22   particular hearing.  I know it was postponed.  I know for you,

23   Mr. Haqq, and for both families that was difficult, but I

24   appreciate you understanding that it's my job to make sure

25   that everything is conducted in the most fair and fully

investigated way possible and so I wanted to make sure all of

that was done.

Certainly I appreciate the victim's family being

here.  I appreciate you speaking.  I know that that is

incredibly difficult no matter who you are or what your

circumstances are, that is incredibly difficult, but certainly

it helps in the Court's consideration and I appreciate you

being here.

Similarly, I know -- Mr. Haqq's family is here, and

certainly I understand in the criminal justice system we

sometimes forget that there's family on all sides and that is

certainly difficult, and so I appreciate you being here.  I

appreciate you being patient with this.  And, you know, this

is one of those situations that's sad on all sides, all

stories, and so I appreciate both sides being here and being

patient and I want to make sure you feel acknowledged by the

Court.

I see all of you here and I understand that there

are lots of emotions in the room.  Certainly, Mr. Haqq, this

isn't a banner day for you, but I think this is a fair and

right sentence under the circumstances.  I hope you take

advantage of the Federal Bureau of Prisons.  I hope you take

advantage of the programming they have, hopefully get, you

know, your medical issues under control.  Hopefully get some

of your addiction issues under control.  And use -- take

1    advantage of whatever is available to you, okay?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  I think that is the best that we can do

4    with ourselves when we wrong someone else is to do our best to

5    do better, and so hopefully the Bureau of Prisons will offer

6    some programming.  I thank you all for your patience.  Is

7    there anything further?

8              MS. MCKENZIE:  No, Your Honor.

9              MR. EGGERT:  No, Your Honor.

10             UNIDENTIFIED SPEAKER:  Can I speak?

11             THE COURT:  No, but I do appreciate you being here

12   and I thank you all for your patience today.  I know it's been

13   difficult.

14   (Proceedings concluded at 11:30 a.m.)

15

16                  C E R T I F I C A T E

17        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

18   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

19

20
         _____s/April R. Dowell_____          4/6/20_____
21   Official Court Reporter, RMR, CRR            Date

22

23

24

25